**W.F. UNGEMACH**

v.

**Sherrell F. GRUBBS.**

**No. CA 3–81–0882–C.**

United States District Court,
N.D. Texas,
Dallas Division.

July 5, 1983.

E. Eldridge Goins, Jr., and Marc L. Luzzatto, Goins & Underkofler, Dallas, Tex., for plaintiff.

Paul L. Smith, Dallas, Tex., for defendant.

## OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Plaintiff, a resident of Indiana, has sued Defendant, a resident of Texas, in diversity under 28 U.S.C. § 1332 over a helicopter that he bought from Defendant. Plaintiff has elected to retain the helicopter and sue for damages under the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41 et seq. (Brief in Support of Plaintiff's Proposed Findings of Fact and Conclusions of Law, page 2.)

### I.

To be more exact, he has requested relief under § 17.50(a)(2) of that Act which reads:

(a) A consumer may maintain an action where any of the following constitute producing cause of actual damages:

(2) breach of an express or implied warranty; . . ., under § 17.50(b)(1) which reads:

(b) In a suit under this section, each consumer who prevails may obtain:

(1) the amount of actual damages found by the trier of fact. In addition the court shall award two times that portion of the actual damages that does not exceed $1,000. If the trier of facts finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000; . . .,

and under subsection (d) which reads:

(d) Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees.

The Defendant contends that the definition of "knowingly" under the T.D.T.P.–C.P.A. found at § 17.45(9) requires any breach of a warranty to be made with knowledge to be actionable.

The definition of "knowingly" found at § 17.45(9) reads as follows:

"Knowingly" means actual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act or practice constituting the breach of warranty, but actual awareness may be inferred where objective manifestations

indicate that a person acted with actual awareness.

Clearly, the reference to § 17.50(a)(2) is only to allow a consumer to prove knowledge on the part of a seller by circumstantial evidence for the purposes of treble damages that may be awarded under the second sentence of § 17.50(b)(1), above.

Apparently, Plaintiff concedes that Defendant did not act knowingly as he has only requested $2,000 under § 17.50(b)(1) in his *Brief,* above, and in Plaintiff's Proposed Findings of Fact and Conclusions of Law, page 7.

Plaintiff has put forth the definition of an express warranty as found in the Uniform Commercial Code as being appropriate for this case. That provision, found at V.T.C.A., Bus. & C. § 2.313 provides:

(a) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

This would appear to be the appropriate definition of express warranty for our purposes. But, the Uniform Commercial Code also contains one other pertinent section.

V.T.C.A., Bus. & C. § 2.316, which provides in subsection (a):

(a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

## II.

Plaintiff is a physician whose practice takes him into several small towns in Indiana. For some time, he has used a small fixed wing aircraft to hop from one to the other so that he can expeditiously meet his obligations. About October 1, 1980, Plaintiff was contacted by Defendant, a dealer in aircraft, about a fixed wing aircraft that Defendant had shown to Plaintiff some time during the previous July. Plaintiff informed Defendant that he was no longer interested in a fixed wing aircraft but was interested in a helicopter. Defendant told Plaintiff that he believed that he had one for sale and would contact him again about it.

Defendant is an experienced fixed wing pilot and a licensed aircraft broker. He thought that he knew of a small, two-place helicopter that was for sale by another physician who also brokered aircraft. He determined that the helicopter was for sale and that he could get it at the wholesale price of $16,500. He also obtained the log book for the helicopter and talked to its previous owner, a close friend. He learned that the helicopter had recently passed its yearly inspection and should have been ready to fly at that time.

Plaintiff and Defendant had several telephone conversations that October and as a culmination of them, Plaintiff agreed to purchase the helicopter and did wire Defendant the agreed upon purchase price of $22,500.

As Plaintiff was not at that time qualified to fly helicopters, he needed to obtain the services of a pilot to ferry the helicopter to Indiana. Defendant assisted him in finding a qualified pilot who was hired by Plaintiff at a cost of $600.

The pilot went to check out the newly purchased helicopter and determined that it was not airworthy. Upon the agreement of Plaintiff, a certified inspector of Enstam helicopters, such as the one Plaintiff had purchased, was hired to inspect the helicopter. He made a list of deficiencies and upon the go-ahead of Plaintiff, signed a work order so that these deficiencies could be corrected. At that time, another work order was signed authorizing the replacement of a windshield, the repainting of the helicopter and the repair of a radio. Plaintiff knew when he purchased the helicopter that a new windshield had been obtained but needed installation and that the helicopter could stand a new coat of paint. He agreed that these maintenance items would be performed at his expense. The former work order resulted in an invoice which Plaintiff paid in the sum of $8,497.82. The later work order was invoiced for $6,026.47. Only $450 of this invoice is shown to be for outside repair of the radio.

The pilot billed Plaintiff for $200 for his time and effort in getting the helicopter airworthy. The certified inspector billed Plaintiff for $900.

In February, 1981, the helicopter was airworthy for a flight from Texas to Indiana, all deficiencies had been corrected that is to say, and the pilot flew the helicopter to Indiana.

From February, 1981 until the time of trial, Plaintiff spent another $12,655.64 to maintain the helicopter in a state of airworthiness. By the time of trial, Plaintiff had either lost faith in the helicopter or was not prepared to undertake the financial burden of maintaining a helicopter and was no longer using the craft purchased from Defendant. He was at that time attempting to sell the helicopter for a price of $35,000.

III.

There is no doubt that Defendant said such things as "This is the finest helicopter in Dallas, Texas" in his conversations with Plaintiff. He agrees that he did say such things. He also said that he had seen the helicopter fly around on a daily basis and that most major components either had zero time on them or little time.

Let us take these representations in reverse order. From a letter written by the certified inspector to Plaintiff (Plaintiff's trial Exhibit No. 6), it does appear that most or all of the usable life of the majority of the major components remained at the time of purchase by Plaintiff.

Defendant testified that he could see the helicopter in question from his office. Whether or not it had been flown in October, 1980, or shortly before that he could not remember. But over quite some period of time, he had seen it fly many times. Saying that he had seen the helicopter fly on a daily basis may have been a bit of an overstatement, but it was nothing more than that.

It is quite clear that Defendant is not an expert when it comes to flying helicopters. When he represented the airworthiness of the 1975 Enstam, he made the caveat that he was speaking based on the log book in front of him and on his conversation with the prior owner. Both the Defendant and the helicopter pilot testified that, normally, the best evidence of the condition of an aircraft is the log book. It was not in this case. Quite apparently, whoever had certified in the log book that the helicopter had been inspected and was airworthy, was not telling the truth.

Defendant testified that he could not tell the airworthiness of the helicopter by just looking at it. The pilot contradicted himself. At one point he said that anyone familiar with aircraft in general should have been able to tell that this helicopter was not airworthy. But then he went on to testify that he really did not know about the airworthiness of this craft until he attempted to start it and fly it. The only things he realized for sure that were wrong before he attempted to start the helicopter

were a layer of dust on it, low gas pressure in the struts it lands upon and a few loose or missing screws in the instrument panel. Inconsequential items on the whole.

Defendant's knowledge of the condition of the aircraft on the date of sale and his representation of its airworthiness as of that date were really based only on the log book. He told that to Plaintiff because of his inexpertness when it comes to helicopters. That was sufficient for Plaintiff to make his decision to purchase the craft. He did not come to Texas to inspect the helicopter nor did he have someone else inspect it for him before the purchase.

Defendant's warranty, if there was one, was really only that the log book said that the helicopter was airworthy. That is what the log book showed. This was not untrue.

It is interesting to note that Plaintiff's initial cost of the $22,500 for the helicopter and the $15,000 to make it airworthy and presentable amount to only about $2,500 more than his asking price for the helicopter two years later, at the time of trial. Even having to spend the additional approximate $8,000 to make the craft airworthy, it does not appear that Plaintiff made too bad a bargain in the first place.

Judgment will be awarded to the Defendant.